The next case on the argument calendar is Marez v. Bassett, and I may or may not have been pronouncing that name correctly. If it pleases the Court, my name is Patricia Berry. I represent the appellant, Candido Marez. He's present in court today. Your Honor, as you all, all three of you know, this is a contractor case involving a free speech violation of the First Amendment. And I don't know if you have any questions about whether or not his capacity as a citizen volunteer on the subcommittee of the mega-contracts of the Small Business Advisory Committee creates any issues for you. If not, I'll move on, because — That is to say, you're asking whether there's an issue under the Garcetti case? Yes. And I don't know if you have any questions on that, because the reason I did not brief it is, as I mentioned in my opening brief, in my reply brief, it appeared that Her Honor, Judge Cooper, had no problem finding that — Now, Judge Cooper's order doesn't mention it one way or the other. Doesn't mention it one way or the other. I think I'm going to address my questions to your adversary on that point, because the issue for me is whether or not a volunteer is an employee for purposes of the Garcetti case. And unless I'm given some cases that pretty squarely say that, I'm inclined to say no. But that's me only. I don't speak for my colleagues. Thank you, Your Honor. The other issue is that he never had his job taken away from him as a volunteer. He was not retaliated against. His reputation wasn't smeared. It's what they did to him as a contractor that we're complaining about, not what they did or did not do to him as a citizen volunteer. The second prong is having, in my mind, established that he was engaged in free speech, is that they had knowledge of his free speech. There's no question in this case that Mr. Netka, who controlled all of the stores, the five or six stores with whom Mr. Maris did business, was well aware of Mr. Maris's outspoken criticism of the Empire contract and was also aware of his complaint when he didn't get the tent bid. It ends up that Mr. Netka ordered the purchase of tents that were unsafe, didn't meet the fire retardant standard. As long as you raise that episode, let me jump to the piece that concerns me there, which is at the end of the long story, what I read even in your brief, is that the contract was awarded to your client. If that's the case, what's the injury? Well, that was the remedy provided by city council, but there was a recognition, and if I could just preface my answer. But keep in mind the question. Sure. What's the injury? Because even if there's a long story of, whoa, at the end of the day, the city solved its own problem and your client has not suffered an injury, I'm not sure there's a cause of action there. Your Honor, I think he did, Judge Clifton, I think he did suffer an injury. He filed a grievance, and Karen Plemons, who we say was under the thumb of Mr. Netka, found against him. It was only by happenstance, thanks to Mr. Yee and his e-mail to Mr. Bassett saying that these tents were unsafe, that he decided to renew his complaint. He had a huge, long struggle. At the end of the day, did he get the contract? He got the contract. What's his injury? A constitutional violation, nominal. That's not an injury. What's his injury? His injury is the retaliation that he experienced by being denied the bids in the first place. I have a question. One last time. Sure. What harm did he suffer? How is he out of pocket? What does he claim for recompense as a result of all of this? Sure. I understand what you're saying. He did not ultimately, he got the tent bid. But what it was is the retaliation was initially being denied the tent bid, and the retaliation was so severe, Your Honor, that they actually gave it to a company that provided an unsafe tent. At the end of the day, you're telling me he's not out of anything. He had to go through a lot of hoops, but he got the contract that he alleges he should have gotten more easily. Well, Judge, I think that would follow this aspect of his claim of retaliation, I think, would fall under the nominal damages, that he did suffer a constitutional violation. The committee recognized that he had. In fact, were so irate at Mr. Necka that Janice Hahn on two occasions called him a liar. And they said it. Judge Pollack, I'm sorry. I think the questions, obviously, that Judge Clifton put look to where was the harm. And if it's not quantifiable in dollars, because the contract was just awarded, then it's unclear where the harm was. But I know that in some of the allegations, it's assertive that Mr. Mares suffered in his health as a result of one or another confrontation. I don't know to what extent that's documented in the record, but I suppose that could be a form of constitutionally recognizable harm. Is there anything in connection with the tent episode that would suggest that your client's health declined? I think in the overall, you take the tent incident and you measure it against everything else that was happening to him. Yes, we've alleged over and over again he was going to the doctor. I can't recall specifically if Mr. Mares' declaration, he indicated that in this process of fighting for his rights with respect to that tent bed, whether or not he had to go see the doctor. But there was no question that he was having heart problems. He would often be rushed to the doctor for treatment of his illnesses. But, Your Honor, even assuming, and what I was trying to say to Judge Clifton is, even assuming with respect to this particular aspect of an overall picture, I could arguably say, okay, give us a $1 jury on this particular incident. But as you've just pointed out to me, compensable harm also includes the fact of pain, suffering, humiliation, because all of this was occurring in plain sight of that committee. Let me end. I'm sorry to interrupt, but I want to make sure the time doesn't run on you too much. I know. There are other things that I see here in the record. For example, there seems to be some evidence, if your client's evidence is believed, that he should have been able to get a bid for silicone compound grease. He should have been able to bid on drill parts, because he was told that only domestic, but it turns out they accepted foreign. There was a bid on tarps. They say, well, the ones you submitted aren't acceptable, even though we've been doing them for five years. I don't see why you don't move us off of the tent example and say there are other items of economic damage that he contends he suffered. Right. I definitely that he had been repeatedly denied the opportunity to bid, and I believe I provided four instances in the record where when they did take the bid, it was to somebody who was charging a lot more money, and we contend in one instance that the loss to the taxpayers or the charge to the taxpayers was at least $6,000. Now you may or may not be able to prove this. I mean, if this goes to trial, I mean, the jury could say, well, I don't believe it, but it seems to me you've got sufficient evidence to get past summary judgment on the question. I would be in agreement, Your Honor, on that issue. I guess I'm not surprised at that point. I just want to repeat, and I'm sorry I got stuck on that one particular issue, because we're talking about an overall picture of environmental and denial of, as Judge Fletcher has pointed out, the denial to bid with the stores. Well, let me ask you, can you focus on we're looking at Judge Cooper's order. Right. And so that ought to be your target. It says that identifies this easy, uptense episode as the only significant episode or the only one for which you submitted evidence to fend off summary judgment, evidence of individual injury. Are you telling me that's not the case, that you have submitted sufficient evidence to survive summary judgment of other specific episodes? I'm just telling us about it, but is there evidence to that effect? Yes, Your Honor. I summarize the actions taken by the defendants against my client at pages 13, 14, and 15 of my reply brief. And I'll quickly go over those because I'm seeing I only have about five minutes left. Repeated denial of opportunities to bid, denial of bid, other harassment concerning the bids at the warehouse. This affected his direct ability to earn a living. This helps to explain the precipitous almost 200,000 drop between 2003 when he wasn't exercising free speech and 2004 when he began exercising free speech. He had the loss of income, which I just talked about, the denial. Mr. Nekka says he has no access to the warehouse. The way you get access to the warehouse is through the telephone bids. Mr. Maris provided a declaration to Judge Cooper. All the telephone calls that I used to get pre-free speech just dried up. You have to have some connection between vendor and the buyers at the warehouses who continue to issue sub-purchase orders. Weren't there restraints on all vendors with respect to access? Well, there was supposedly a facially neutral memo issued one month after the discussion in March of 04. That was issued in April of 04, that all vendors have to make an appointment. The point we're making is that Mr. Maris could not even get in to make the appointment because Mr. Nekka issued a blanket order, no contact whatsoever with Mr. Maris. This all also was precipitated by threatening phone calls in March, excuse me, in April and May of 04 that were traced to Mr. Eshem's phone. Who's Mr. Eshem? He's the fellow who lost his job to Mr. Dimon. Mr. Nekka then demoted Mr. Dimon and brought back Mr. Eshem and the job that he once had. He split SPOs and sold tents for $149 to Mr. Maris just as Mr. Dimon did. Mr. Dimon got demoted for doing identically the same thing that Mr. Eshem did. Mr. Eshem became the helpmate of Mr. Nekka to carry out this campaign of retaliation against Mr. Maris by not contacting him through telephone bids, by not allowing him into the warehouse. That was story number two. Ms. Barry. Yes, Judge Pollack. At whatever point, maybe you could have the possibility of telling me. I don't want to interrupt your particular answer here. But with respect to allegations of concrete damage that might be measurable in dollars, there's been a reference in the submissions to an incident involving the Klein snaps, which, as I understood it, your client had to supply, felt compelled to supply nine uncharged Klein snaps. Now, it may seem curious, but I don't know what a Klein snap is. Is there anything in the record that tells us what a Klein snap is and whether nine would be a significant damage? Maybe you can just hold on to that and complete your answer to Judge Clifton. I can't answer it. I thought the Klein snap would be some kind of large. I'll tell you what. Before you have to worry about answering it now, we'll give you a chance to respond. And my guess is your client knows the answer. Okay. So you can talk to him. I understand that. So during the time your adversary is talking, you may be able to find out the answer. All right. Thank you, Your Honor. And I'd be interested to know how much each Klein snap costs. Like, are we talking $0.10 a piece, $10 a piece, and so on and so forth? Okay. I appreciate that. All right. Going on in terms of what we contend to be the retaliatory actions taken against Mr. Maris, you know, I have 1.57 minutes. Could I save that for later? Why don't you save it? Let's hear from the other side, and then you'll have a chance to respond. Okay. I appreciate it. Good morning, Your Honors. Lisa Berger, Deputy City Attorney, appearing for the City of Los Angeles. To answer Judge Fletcher's question about whether there's any case law specifically applying Garcetti to the volunteer situation, the only case I was able to find was a district court case out of Connecticut, Ansel v. Delisio. It's cited on page 35 of my brief, 485F2nd80. But there is plenty of case law that says that a volunteer has the same protections from retaliation that an employee does. Yeah, but that's different. Yes, but if a volunteer is going to get the protections, then it seems that the volunteer should also have the same restrictions. Doesn't the court go ahead? I'm puzzled here as to how any of this fits because the retaliation or the alleged retaliation doesn't fit the employee model. The employee model of the Garcetti case is meant to say a public employer has the same rights as other employers, so you can discipline one of your employees for that reason. But in this case, the so-called discipline had nothing to do with his position as a volunteer. He wasn't, for example, removed from the committee. He wasn't given contracts outside. I don't see how the government could possibly justify that as simply the activity of an employer, albeit a public rather than private employer. You're not allowed to retaliate in an outside fashion for something that was done. Well, first of all, I believe that the Garcetti case was not discussing whether or not it was what rights the employer had. It was discussing what is protected activity for purposes of the discrimination retaliation statutes. What is First Amendment conduct? And if it is something that is done as part of your job and you're essentially required to do it, it's part of your duties, then it's not protected speech. I don't think that has anything to do with whether you're a volunteer or an employee. Well, except in Osan, sir. Please go ahead. How about his status as a contractor? Didn't, indeed, didn't the court below recognize that the case authority for the proposition that an independent contractor who's engaged in a regular way in that relationship is to be assimilated to the role of an employee? Yes. But I think that those are two different questions. One is whether he has an independent contractor has protection from retaliation and other types of discrimination. The other is what is protected speech, which is an element of the cause of action. And under Garcetti, protected speech does not include anything that's done in the scope of your employment, which, at least in one case out of Connecticut, a volunteer has specific duties that they are asked to do, whether you're volunteering at the dog pound, cleaning out cages, or whatever it may be. As a volunteer, you have a specific role you're being asked to play. And Mr. Maris has never disputed. In fact, he has repeatedly said that his appearances in front of city council were in his role as a member, a co-chair of this small business committee. So he was, there's no question he was speaking to council in that role. The only question that the Court obviously has is whether or not that puts him in under Garcetti or not. That's completely different from whether or not an independent contractor can have a claim for retaliation. Okay. Now, let me ask you with respect to various aspects, various contentions that Mr. Maris makes as to whether or not he has been punished or retaliated against for his speech, what's your response to the snaps, to the silicone grease, to the drills, and the tents that I just, not the tents that gave the original problem, but the tarps, those examples that we just put on the table. Is there evidence in the record from his side, you don't have to believe it, but is there evidence in the record from his side that he was not allowed to bid on those contracts or lost those contracts? There is his declaration and his subjective viewpoint as to certain things that happened. By subjective viewpoint, do you mean we're not supposed to pay attention to what he says? No, that there's, he didn't present, excuse me, present evidence in support of any of those things. He didn't present evidence of the context or anything. So it's merely his declaration. Merely his statement? His statement is not enough? I think when viewed in the entire context, and what the district court found was that even if there may be little, an incident here, an incident there, isolated sporadic incidents where he felt disrespected or where he felt he had been. I'm not talking about disrespected, and I'm not talking about sort of bad-mouthing. I'm talking about he apparently has presented evidence that in his view, based on his, that he understands what happened, there were certain contracts that he wasn't alerted to, certain contracts that he was denied unfairly, and so on. And we just had nine client snaps, whatever they are. He'd counted them two times. The supplier counted them one time, and then all of a sudden they turn up short. I mean, is there, do we have evidence in the record that supports what he says? Of course, there was no evidence that that supplier knew that he was speaking out to the Empire contract, had any reason to want to retaliate against him because of his speaking about the Empire contract, or that there was any causal connection whatsoever to his speech. But the, what the evidence shows is that he said himself that he had no problem getting access to bids, that he worked frequently with the DWP liaison in the purchasing office. The evidence showed that other than the one aberrant year where he was doing excessive and at least allegedly improper business with Store 2, in the years before that and the years after that, he was making between $300,000 and $400,000 a year in receipts. There was no change in that. Even though he was required to start participating in competitive bidding to actually follow the law to allow everybody an equal chance to bid on these contracts, he still was making the same amount of money. So even if he were to be ---- I'm not saying that there was no change between 2003, 2004, and then the drop in 2005. What I'm saying is that there was one spike in the 2003, 2004 year that was directly tied, even by Mr. Marris's own admissions, to the improper use of SBOs at Store 2. And other than that, in the years before that year and in the years after that year, he made roughly the same amount in the $300,000 to $400,000 range. Even though he was required to do most of his bidding by competitive bidding, as all the vendors were, the evidence showed that whatever the use of SBOs in a two-year period after the policy was changed went down from $3 million a year to $1 million a year, that instead of being business being done almost entirely through SBOs, it was down to 25 percent SBOs and the rest using the proper competitive bidding. And despite all of those changes that applied to all the vendors, Mr. Marris continued to do just as much business as he had with the exception of that one year. Yes. How does that support summary judgment, which precludes the possibility of suffering a loss? May I look at the numbers? And take out the one year, 2003, and even accept, which for the moment I will, that it's not factually contesting that that was a spike or an aberration that should be disregarded. It's literally true that if you go to the year before, 2002, he had a higher number there than he had in the subsequent year. I believe that was by perhaps $10,000, wasn't it? Fine. But how does that say as a matter of fact that he suffered no injury? Because the changes were due to policies that applied across the board. There is no evidence of any vendor who did not have to change the way they did practices, no evidence of any vendor who didn't have to increase the use of competitive bidding and lower the use of SBOs. Is that an explanation that's uncontested? Because if the answer to that question is not yes, I don't understand how this can be a subject of summary judgment. And in fact, if plaintiff has himself contended that's not why it happened, I was excluded from bids that in the past I was allowed to bid on. Mr. Maris conceded that the policy changes applied to all the vendors across the board. That's not answering the question. The question is did he concede that he was not excluded from bids, that he did not lose income because of any of the purported retaliatory steps? No. Then how is this a matter of no genuine issue of material fact? If, in fact, he was excluded from the opportunity to bid because of retaliation, isn't that a potential financial loss? It's not a potential injury. If there were evidence of – let me split that into two pieces. If being prevented from bidding on one bid over the course of a number of years of a lucrative career would be sufficient to state a cause of action, then you're correct. Summary judgment would not be appropriate. And – Stop right there. Why isn't that sufficient? Well, that's why I need to go to my aunt. And if it were shown that the denial of that one bid was in some way connected with the speech, assuming that it's not, that it is protected speech, which I have not conceded it's not. But there also has to be a showing that these incidents, the Kleinvolts, the – he wasn't given calls – well, he couldn't apparently get these bids through the purchasing department liaison. He just wasn't getting calls from the actual storekeepers, which was exactly what the policy changes were meant to do. But there's no showing of any connection that the people, the person who counted the Kleinvolts, the – any of these other people, other than the fact that they worked in a store that's three layers up, Mr. Nedko oversaw. There's no indication, no evidence whatsoever that Mr. Nedko was telling people in – underneath him, you know, get Mr. Maris, we don't like him. There's no indication that any of these people knew or cared that he was speaking to city council and that empire. Well, you know, that's not right. I mean, we've got these telephone calls that I won't even repeat the word. And they're traceable to a phone number. I mean, there is evidence. A jury might decide that it's insufficient, but there is evidence. Mr. Esham, who is connected to those phone calls, is not alleged to have done anything to Mr. Maris other than those phone calls. He's not shown to be involved in any of these eyesore business. But it seems to me that a jury could reasonably infer, if you're getting phone calls like that that are in direct response to what he's saying about the problems, that within that department that there are various things that could happen. I think it's reasonable for a jury to infer that. The jury may or may not do that. But there is evidence here that there is some hostility within the department of Mr. Maris based on what he has said. Even if there's evidence of hostility to Mr. Maris, there isn't evidence saying that it's because of his speaking out on the empire contract. Well, you know, usually when people discriminate or retaliate unlawfully, they don't say, I'm doing this because they do it. And it's left for somebody else to infer the because. But if you're using the telephone calls as the evidence showing that everybody involved in these particular incidents must have known about the empire contract and were acting in reaction to it, there's nothing in those phone calls that says that's why, if it was Mr. Esham, that's why he was making the calls. There could be any number of reasons and things that he thought Mr. Maris was doing that he thought he should stop doing. It's – there's certain substantial evidence that doesn't come together. Here's another one. Mr. Peterson, an employee in June of 2005, asked Mr. Maris if they had, quote, broken him yet. Now, that in itself is not necessarily conclusive, but it does seem to me evidence from which a jury could infer certain things. But, again, nothing that ties it to his speaking out regarding the empire contract. Another reason they want to break him? There could be any number of reasons. I have no idea. On summary judgment. Because on summary judgment, we need a conclusion that's not disputed. And plainly, this is a conclusion you say, well, there could be any number of reasons. Well, that's not enough to get summary judgment, is it? You're basically saying you think a jury's going to find you in your favor. Fine, but our job isn't predicting. Would it be unreasonable for a jury to draw the inference? That's the question we have to face. And when you have threatening phone calls, you have no other visible reason why somebody should decide to go and exclude him from the process. A jury might make the inference. It might not be a real strong case that happens. I don't think it sounds like a particularly strong case, but that's not the question we're asking right now. We're asking why is it a summary judgment case? Because there are certain elements to the cause of action, and he can't put them together. He cannot show that he suffered an adverse action that had an actual damage to it, and he can't show that whatever he did suffer, that he alleges he suffered, was connected to his speech regarding the Empire contract. He's basically saying I have a right to sell my products at the price I want to sell them and the way I sell them, regardless of what the city wants, regardless of what the charter requires. I mean, there is no question, he says it blatantly flat out in his briefs, that this is all about his right to sell directly to the warehouses using SPOs, and he has no right to do that. He has no right to shut out the other contractors. He has no right to avoid competitive bidding. Where in his brief he identifies that as his cause of action? If I had a moment, I could definitely show you. I just reread these briefs, and in fact, Ms. Berry said it this morning. Page 3 of the reply brief. The problem was never competitive bidding. The problem was selling to the warehouses controlled and run by NEDCA. It's throughout the brief. That was the position, even to a certain extent in the summary judgment motion. Basically, we're saying that it didn't have anything to do with whether he was making money on competitive bidding or not. It was all about his right to be able to sell directly to the warehouses using SPOs. That other people were using SPOs, but he wasn't allowed to do it anymore. Okay. Before we sit down, I've got one thing I'd like to draw to your attention. If you'll turn to page 36 of your brief, please. That first full paragraph under reduced SPOs, you quote the Kosalter case, and you write, while damage need not be great to violate constitutional rights, the plaintiff must have lost, quote, a valuable government benefit or privilege. And then you close quote, and then you cite Kosalter. I'm reading from the page in Kosalter that you're citing to. I'm not just reading from Kosalter. The magistrate judge incorrectly concluded that if an alleged retaliatory act cannot be characterized as the loss of a valuable government benefit or privilege, it can never constitute an adverse employment action in a First Amendment retaliation case. Such a restrictive definition of adverse employment action is inconsistent with our case law. I think you have read Kosalter in that language 180 degrees wrong. It's certainly possible. Not intentionally, I can assure the Court if that is the case. Okay. But I think you're saying in your brief precisely the opposite of what Kosalter said, and you're quoting Kosalter for that proposition. And I apologize. I'll say no more about it. This is one thing in the brief that drew my attention. You had the misfortune of having on the panel the author of Kosalter. I have one question before you stop. Earlier in your argument, I understood you to say that Mr. Maraz had acknowledged that there was no more injury to him than to anybody else, or that he was equally damaged. Did you not? I don't think I put it quite that way. What I said was that he acknowledged that all of the changes in procedure, the cutting of SPOs, the requirement of competitive bidding, the not being able to just hang out at the warehouse and be pals with everybody, that that applied to all of the vendors across the board. And I take it that that was the reference to his deposition that was cited by the court below. More importantly, Maraz concedes that Metca's reforms affected all vendors equally. Yes. I'm wondering whether page 207 of the deposition really supports the rather broad construction that the judge put on it. He acknowledges that all of them were told not to come directly, but they had to make appointments. That doesn't really comprehend the whole range of concerns, does it? I'm not sure I understand your question, Your Honor. Well, the recital by the court is, and I thought you were adopting this recital, but maybe I'm wrong. More importantly, Maraz concedes that Metca's reforms affected all vendors equally, citing page 207, such that Maraz cannot identify any individualized injury that would have been reasonably likely to deter him from engaging in further protected speech activity. Now, I suggest that page 207 of the deposition certainly does nothing to support the second half of the court statement. I wonder if there's anything on that page that says to us anything more than that, yes, we were all told that we couldn't continue the practice of making individual appointments to talk to storekeepers. I don't, without having the order right in front of me, I don't know that Judge Cooper intended the second part of that to be, to refer to the deposition page for that second part. My guess would be that she meant that because he conceded it applied equally to all the vendors, therefore, he could not show. But I don't have the order in front of me. All right. If the Court has no other questions. Okay. Thank you very much. And, Ms. Barry, you've saved a little time. And you'll get to say what you need to say. We let your adversary go over a little bit. You just say what you need to say. Oh. Thank you. Thank you, Judge. I consulted with Mr. Maris on the Klein Snaps. They're safety hooks designed for what? For safety ropes, Your Honor. And the loss to Mr. Maris was $200. I'm sorry, $1,200 on that particular incident. Does it say each Klein Snap is worth something over $100? It was the continued reordering, sir, that I was denied. I never got another order after that. I see. So each Klein Snap is not worth that amount. Okay. No, no. No, they're not. No, no. Okay. Okay. Your Honor, in terms of this whole defense that was advanced for, or I'm sorry, which formed the basis for the motion for summary judgment, which was this competitive bidding business, I objected vociferously to the presentation of any summary of evidence by Defendant Bassett, Defendant Nedka, and I think there was, oh, Defendant Feldmeyer, on the grounds that, number one, I didn't get the underlying data on which those summaries were based. Number two, arguably, there was a Rule 37 violation, because apparently they thought it was important enough discovery to use at the summary judgment that they never provided me. But in any event, I never got the underlying data. What Her Honor said in response to my evidentiary objection, she noted that I, I think her word was adamantly objected, and she said she didn't have to consider those exhibits. And yet, in the brief here on appeal, the answering of brief, they do rely on those summaries. They do rely on those summaries without the underlying evidence to which I objected. And that's the only way that they can push what they're arguing in the brief, and that is that competitive bidding was taking over in place of the use of the SBOs. There's another thing I want to clarify, and I happen to have been litigating DWP for four years, so I feel I'm somewhat of a historian on the issue of the SBOs. There's a difference between the splitting of the SBOs and the SBOs. The SBOs continued. They continued. The buyers continued to hold jobs. The SBOs continued to be produced in order to make purchases of 1,000. And the splitting of the SBOs took on. And I refer the panel to Volume 4, pages 587 to 605, which is about 18 pages, dealing only with Store 2 purchase orders. I figure that in the year 2005 alone, my client had an opportunity to at least make some purchases of 3,000 sales is what I figured. Okay. Okay. So that this whole notion of competitive bidding was based on evidence that, as Her Honor acknowledged, I objected to. Okay. We're now a minute over. If you've got one last thought with which you would like to leave us. I would like to, in this day and age of Madoff and then Sunday, I saw another lawyer. Madoff's not our case. I understand. But I think there's a moral, there's moral fabric here that we can't forget about. And, Your Honors, my client had an opportunity to play ball with Mr. Necka in March and April of 04. According to what my client stated under oath, Mr. Necka, in effect, made what my client considered to be a bribe. I'll even give you a contract for a million bucks. And Mr. Maris testified under oath in his declaration, perhaps in his deposition, but certainly in the declaration, he said, no, I'm not playing that game. And there then played out this scenario that I have been describing in the briefs. Okay. All right. Thank you. Thank you very much. Thank both sides for their arguments. Maris v. Bassett is now submitted for decision. The next case on the argument calendar is Sear v. Reliant Standard Life Insurance.
judges: Pollak, Fletcher W. , Clifton